UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



FILED
2017 NOV 22 PM 3: 45
US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA
ex rel. LISA WEISS,

      Plaintiff-Relator,

v.

LOCKHEED MARTIN CORPORATION
and LOCKHEED MARTIN INTEGRATED
SYSTEMS, LLC, f/n/a LOCKHEED
MARTIN INTEGRATED SYSTEMS, INC.,
all foreign corporations or entities,

      Defendants.

_____/

CASE NO. 6.17-CV-2030-ORL-41EJK
**FILED UNDER SEAL**

**DO NOT PUT ON PACER**

## RELATOR'S FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff-Relator LISA WEISS ("RELATOR"), by and through her undersigned counsel, hereby files, under seal, this Complaint and Demand for Jury Trial against Defendants, LOCKHEED MARTIN CORPORATION ("LHM") and LOCKHEED MARTIN INTEGRATED SYSTEMS, LLC, f/n/a LOCKHEED MARTIN INTEGRATED SYSTEMS, INC., (unless otherwise distinguished, collectively "LMIS") (all three entities hereinafter collectively referred to as "DEFENDANTS") and alleges as follows:

1.     RELATOR brings this action on behalf of the United States of America and on her own behalf against DEFENDANTS for their violation of the Federal False Claims Act ("FCA"), 31 U.S.C. Sections 3729-3733.

2.     This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. Nor are the allegations or transactions set forth herein substantially the same as allegations

or transactions publicly disclosed (i) in a Federal criminal, civil or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) from the news media.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction under 28 U.S.C. Sections 1331 and 1345 as well as under 31 U.S.C. Section 3732.

4.     Both DEFENDANTS can be found, reside, or transact business in the Middle District of Florida. Additionally, nearly all the conduct and acts set forth in this Complaint and otherwise proscribed by Section 3729 of the FCA occurred in this District. Accordingly, venue is proper in this District with respect to all claims set forth herein pursuant to 31 U.S.C. Section 3732(a) as well as 28 U.S.C. Section 1391(b)(1) and (2).

## PARTIES

5.     RELATOR is and was a resident of Orange County, Florida, in the Middle District of Florida, at all times relevant to this Complaint. RELATOR has been employed by the United States Department of Defense ("DOD") since March 2009 and has served in various accounting, financial and contracting roles for DOD. Relator holds both a Master of Business Administration (MBA) degree and a Master of Arts in Procurement and Aquisitions degree. Since July 2014, Relator has served as Contract Administrator for the Defense Contract Management Agency ("DCMA") of DOD and, since that time, has been assigned to LHM's facility at 5600 Sand Lake Road, Orlando, Florida through the present.

6.     RELATOR is an "original source" within the meaning of 31 U.S.C. Section 3730(e)(4)(B) of the information upon which the allegations set forth in this Complaint are based, such information having been derived through RELATOR's employment by DCMA as a Contract

Administrator for the Joint Air-To-Surface Standoff Missile ("JASSM") contract, which was awarded to LMH or any predecessor-in-interest, in or about June 1996, and shortly thereafter novated to DEFENDANTS. RELATOR has voluntarily provided such information to the Government (to wit, her supervisors in DCMA and the Office of Inspector General (OIG) for DOD) prior to the time of any public disclosure as defined by Section 3730(e)(4)(A); or, in the alternative, RELATOR has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions which may exist, but of which RELATOR and undersigned counsel are presently unaware, and RELATOR has, for a second time, voluntarily provided such information, through counsel, to the Government (to wit, the United States Attorney's Office for the Middle District of Florida) prior to the filing of this action, pursuant to Section 3730(e)(4)(B)(1) and (2). Furthermore, notwithstanding her status as a Government employee, under Section 3730(b)(1) as construed by controlling case law in this Circuit, RELATOR is "a person [who] may bring a civil action for a violation of section 3729 for the person and for the United States Government." Accordingly, RELATOR has standing to file this action and this Court has subject matter jurisdiction over the matters set forth herein.

7.       Defendant LHM is a for-profit corporation organized under the laws of the State of Maryland with corporate headquarters in Bethesda, Maryland and operates its Missile and Fire Control division at a sprawling facility located at 5600 Sand Lake Road, Orlando, Florida, in Orange County, Florida, in the Middle District of Florida. LMH is a global aerospace, defense, security and advanced technologies company with worldwide interests. It was formed upon the merger of Lockheed Corporation and Martin Marietta in or about 1995 and is publicly traded on the New York Stock Exchange with a present market capitalization of approximately $90 billion. LHM is the largest single contractor for the United States government as a whole and the largest

for the United States Navy, Air Force and Army. In 2015, LHM had obligated contracts with the federal government of $36.2 billion which was more than twice the amount of obligated federal government contracts held by its next closest competitor, Boeing Company.

8. At all relevant times, Defendant LMIS was a for-profit corporation originally organized under the laws of the State of Delaware and was a wholly owned subsidiary of LHM. In August 2016, LMIS changed from a Delaware corporation to a Maryland limited liability company and remained a wholly owned subsidiary of LHM. At all relevant times, LMIS, INC., conducted business in Florida from the same facility as LHM's Missile and Fire Control division at 5600 Sand Lake Road, Orlando, Florida in Orange County, Florida, in the Middle District of Florida. Through a series of contractual novations, both LHM and LMIS, INC., ostensibly performed under the JASSM contract at issue in this action and invoiced and received payments from the government in connection with said contract.

9. DEFENDANTS were fully aware of the false and fraudulent acts identified in this Complaint, authorized the commission of such false and fraudulent acts and derived substantial financial gain from the commission of such false and fraudulent acts. In all instances, DEFENDANTS can be said to have acted "knowingly" as that term is defined in 31 U.S.C. Section 3729(b)(1), in that management and authorized personnel of DEFENDANTS, individually and collectively, acted with actual knowledge of the information set forth below, including, but not limited to, the information alleged in paragraphs 10 through 50 of this Complaint; or acted in deliberate ignorance of the truth or falsity of said information; or acted in reckless disregard of the truth or falsity of said information.

## FACTUAL BACKGROUND

### The Joint Air-to-Surface Standoff Missile Program

10.     The Joint Air-to-Surface Standoff Missile (JASSM) Program produced a family of stealthy cruise missiles, which were developed, engineered and manufactured in Orlando, Florida by Lockheed Martin Missiles and Fire Control ("MFC"), an operating entity of LHM, under contract awarded by the Joint Program Office (JPO) of the United States Air Force (USAF) in or about June 1996. The missile is guided by a combination of GPS/INS positioning en route and imaging infrared for final targeting. It carries a dual-mode penetrator and blast fragmentation warhead at subsonic speed, in a body shape designed to have a very low radar profile.

11.     The U.S. military reportedly intends to buy over 5000 missiles in this family, including an extended range version, with production extending into fiscal year 2021 and beyond. (Exhibit 1, p. 3). The missiles are integrated on a variety of USAF platforms including both heavy bombers and fighter jets. Published reports indicate that the unit cost for the baseline AGM-158 JASSM is currently around $1 million per missile. In June 2017, LHM was sought and was awarded a $413 million contract (the so-called "obligated amount," which is the ceiling in a cost-based contract) for the production and delivery of 360 extended range versions of the cruise missile (JASSM-ER). (Exhibit 1, p. 5)

12.     RELATOR alleges, as more fully developed below, that the United States has been defrauded of more than $400 million over the past 20 years under a still open, and yet to be reconciled, cost-based contract between United States Air Force and LHM and its wholly owned subsidiary, LMIS, in connection with the Joint Air-to-Surface Standoff Missile program. Despite

RELATOR's earnest attempts to bring her findings to the attention of her superiors in DCMA and DOD for appropriate action, those efforts have been rebuffed and she has been isolated and marginalized.

13. The United States Air Force has a Cost Plus Award Fee contractual relationship with DEFENDANTS for Engineering and Manufacturing Development ("EMD") of the Joint Air-to-Surface Standoff Missile ("JASSM"). The actual contracts are in the possession of DEFENDANTS and bear the following numbers: F0862696C002; F0863502C0026; F0863503C0010; and FA868204C0060. The JASSM contract that is the primary subject of this Complaint is F0862696C002 ("JASSM Contract 0002" or simply "Contract 0002") and is the largest of the four original contracts which were awarded in about 1996 or shortly thereafter. As of March 6, 2006, under JASSM Contract 0002, DEFENDANTS invoiced DOD $591,994,648 and received from DOD $586,468,169, leaving an unpaid balance of $5,526,479. (*See* Exhibit 2, Exh. A, p. 9). With the exception of a very limited number of fixed-price line items, under the terms of JASSM Contract 0002, DEFENDANTS were entitled to receive their actual costs plus an award fee not to exceed 15% of the total actual contract costs depending upon the performance rating given by the Air Force. An additional $20,000,000, in two (2) increments of $10,000,000, was available if certain exit criteria at identified stages of the program were successfully completed. (*See* Exhibit 3, p. 4).

### Relator's Close-Out Work for DCMA at Lockheed Martin

14. In July 2014, RELATOR started working for DCMA-LHM Orlando as a Contract Administrator on the JASSM program. RELATOR's duties include administrating, closing,

monitoring, and ensuring compliance of the terms and conditions of the JASSM contracts that originally consisted of four (4) major contracts and 93 delivery orders. In 2015, RELATOR was assigned to work on a close-out team which was tasked to close aging cost contracts. In June 2016, RELATOR was repositioned to work back on the JASSM program as a Contract Administrator and assigned to contract F08626-96-C-0002, the largest of the original JASSM contracts ("Contract 0002"). The Administering Contracting Officer (ACO), Carlos Velez, had been working relatively minor accounting discrepancies regarding JASSM Contract 0002 and RELATOR's initial involvement was minimal.

15.     In a March 23, 2016 email sent by Scott Dieffenderfer (LHM Senior Contracts Negotiator), LHM acknowledges to Dana Alexander of JPO USAF (the customer or buyer under Contract 0002) a financial disparity of $323,600. (Exhibit 4). In that same email, Dieffenderfer advocated for the swift conversion by the USAF of Contract 0002 from a "hybrid" contract that contained hybrid Contract Line Item Numbers (CLINs), which included Cost Plus Award Fee (CPAF), Time and Material (T&M), and a limited number of Firm Fixed Priced (FFP) CLINs, to a contract with all Firm Fixed Price (FFP) CLINs. Dieffenderfer further stated that this conversion would expedite the close-out process and that he was acting under pressure from "senior levels" at Lockheed Martin. "This my No. 1 contract closeout priority." (Exhibit 4). It is not known whether Dieffenderfer was personally aware of the magnitude of the overcharge by LHM, as opposed to "senior levels" of management at LHM from whom he took direction.

## LHM Seeks to Convert Cost Plus Contract to Firm Fixed Price Contract

16.     Converting all the line items or CLINs to FFP would allow for the waiving of required cost reporting requirements of a cost contract (including a Defense Contract Audit Agency (DCAA) final cost review and a DCMA cost and price team review), thereby negating any obligation on the part of LHM to provide accurate, supporting cost data. It should be noted that, in terms of dollars, the cost-based line items or CLINS represent by far the largest component of Contract 0002 since it is a production contract and the actual cost of designing, engineering and manufacturing the deliverables were unknown at the time of contract. Similarly, while the hourly rates for LHM in-house labor (engineers, technicians, computer specialists, etc.) are generally known and tentatively agreed upon (subject to post-performance review by DOD's Defense Procurement and Acquisition Policy (DPAP)), the number of hours to be expended in the project is unknowable at the time of contract and cannot be fixed in advance of performance.

17.     Cost-based contracts are similar to "cost plus" contracts where the contractor is entitled to an award fee on top of its actual costs, not to exceed a certain flat amount or percentage of the total costs, subject to meeting certain performance criteria. A cost-based or cost plus contract generally sets forth (on a line item basis) a negotiated ceiling for the product or its components known as the "obligated amount." That term simply means that the government is required to pay up to that obligated amount assuming, of course, that the actual costs support that amount.

18.     Contractors generally, and legitimately, negotiate for as high a ceiling as possible to cover higher actual costs than anticipated. Should the actual costs be under the ceiling or "obligated amount," the contractor is limited to its actual costs plus any applicable award fee.

Accordingly, the government is dependent upon the honesty and the integrity of the contractor in reporting its actual costs and the number of labor hours, but retains the right to audit the costs and hours claimed by the contractor at the close of the contract. This had not yet occurred on JASSM Contract 0002 for reasons outside the control of the government, despite the fact that the contract was fully performed as of July 2008.

19.     In a March 30, 2016 email, Dieffenderfer again requested that the conversion modification (MOD) be executed from hybrid to FFP after the $323,600 disparity was resolved by LHM and DCMA finance teams. (Exhibit 5). This $323,600 issue was batted around for a while, masking the existence, and delaying the discovery by RELATOR, of a discrepancy in the neighborhood of $400 million between the amounts billed and received by LHM (which for virtually all line items or CLINs under Contract 0002 was the ceiling or "obligated amount") and the actual costs incurred by LHM.

20.     Discrepancies of this type and relatively insignificant magnitude, such as the $323,600 disparity, are focused upon single line items or CLINs and Accounting Classification Verification Numbers (ACRNs) for specific services rendered or items purchased under the contract. Due to the complexity and size of contracts such as JASSM, it is often difficult to look at the totality of the contract so discrepancies are usually limited to single CLINs or ACRNs.

21.     Unfortunately, this small bore approach often misses the forest for the trees. The totality of cost accountability generally comes during final voucher audits on a cost-based contract at the closing of the contract. In this case, as with many other similar contracts awarded to LHM, RELATOR advises that cost-based contracts are customarily sought to be modified and converted

entirely to an FFP contract to relieve the administrative burdens of contentious audit and review procedures and mollify high ranking officials on both sides who often surprisingly, but for divergent reasons, desire to expeditiously close overaged contracts with a minimal amount of embarrassment to either party. This transactional accommodation, of what might otherwise be considered competing interests, often leads to both sides wishing to sweep matters under the rug, so to speak, with only lip service being given to the principles of integrity and accountability.

22.     This is especially the case with entrenched and highly regarded contractors, such as LHM, upon whom the government is very much dependent in supplying this country's defense and military needs. However, this accommodation often comes at great financial expense to the United States and honest taxpayers who ultimately foot the bill for savvy and unethical contractors who know how to game the system.

23.     On August 17, 2016, ACO Velez requested from his Air Force counterparts the status on the conversion from a hybrid cost contract to a FFP contract which LHM was pushing. (Exhibit 4). Responses to that particular email were not forwarded to RELATOR.

24.     On May 30, 2017, ACO Velez sent Dieffenderfer and Marie Dolan (LHM JASSM Finance) a request for an obligation and disbursements history on JASSM Contract 0002, which would show the amounts billed against the ceilings on each of the line items. (Composite Exhibit 6). In response, June 4, 2017, Marie Dolan provided an excel file which showed billed and paid amounts under Contract 0002 through DCMA modification #21 (MOD A00021) of $588,161,975 against the aggregated ceiling or obligated amount of $588,214,052, leaving an unliquidated obligation (ULO) of $52,076 (Composite Exhibit 6).

25.     On June 14, 2017, ACO Velez replied to LHM's Dolan and Dieffenderfer that there were 13 CLINs that were not matching between LHM billing records and DOD's computer system known as MOCAS (Mechanization of Contract Administration Services). (Composite Exhibit 6). However, through that point in time, <u>no actual cost data was ever provided to justify the amounts billed under Contract 0002.</u>

26.     In actuality, the discrepancy between the amount invoiced and paid to LHM and the amount of actual costs under Contract 0002, as RELATOR would later learned, was many times larger, in the neighborhood of at least $400 million.

### Attempts to Unilaterally Close-Out JASSM Contract 0002

27.     The conversion of Contract 0002 to a firm fixed price contract failed to gain the support of the buyer, which was JPO USAF. In July 2017, ACO Velez asked RELATOR to research how to effect a "unilateral close-out" of Contract 0002. RELATOR strongly opposed the unilateral close-out by DCMA of Contract 0002, which would negate any requirement that LHM certify the accuracy of its underlying costs and likely impair DOD's ability to demand recoupment of any overpayments.

28.     When RELATOR questioned the close-out further, she was told by ACO Velez that DCMA Supervisor Jeffery Klenk (Velez's superior) had asked Velez to do so. RELATOR asked Velez why the DCMA Supervisor requested the unilaterally close-out of a cost contract with no actual cost data and unresolved discrepancies. ACO Velez could give no coherent answer but nonetheless continued to press RELATOR to proceed with researching the necessary steps to unilaterally close-out a cost contract with missing supporting data. It was apparent to RELATOR

that ACO Velez was under considerable pressure from Supervisor Klenk to proceed with the unilateral close-out on Contract 0002. (Exhibit 7).

29.     ACO Velez attended a close-out meeting on September 6, 2017 with LHM officials regarding Contract 0002 to which RELATOR was not invited. After the meeting broke, Velez advised RELATOR that LHM stated in the meeting that it "had lost two (2) years of cost data due" due to a transference of Contract 0002 in 2006 from an entity identified at the meeting by LHM, according to Velez, as simply "LMIS," without any elaboration as to either what the acronym stood for or what the relationship was between the LHM and this other entity. ACO Velez told RELATOR that he was under the impression that they were two separate companies. Velez also told RELATOR that LHM had stated at the meeting that LMIS had since "gone out of business," a representation by LHM which RELATOR learned to be false later that same day after doing a Google search on LMIS which was shown as still active and doing business with DOD on other contracts, operating out of the same location as LHM, 5600 Sand Lake Road. LHM's representation to DCMA at that meeting that two years of cost data was missing also proved to be false as RELATOR learned the following week. *See* par. 35, *infra.* The only conceivable purpose of LMH falsely representing to ACO Velez a loss of supporting cost data on Contract 0002 was to avoid a reconciliation and audit by either DCAA or the price and cost team of DMCA. Velez did not identify the LHM official(s) who had made these statements and RELATOR did not think to ask him at that time. The identity of any such official who made these false statements to ACO Velez can be obtained by the Attorney General or his designee pursuant to civil investigative

demand authority of the Attorney General under Section 3733 of the FCA prior to the Government electing to intervene in this action under Section 3730(b)(2).

30. In an apparent attempt to accommodate LHM in light of the objection by JPO USAF (the buyer) to LHM's request for conversion to an FFP contract, DCMA in Orlando, believed by RELATOR to be operating under pressure from LHM, was pushing for an ACO determination to unilaterally close Contract 0002. RELATOR thought it rather odd that Contract 0002, which was nearly fully performed and paid on in 2006, would be supposedly transferred or novated that late in the game. RELATOR came to learn that Contract 0002 had been novated on at least eight (8) separate occasions over the past 18 years between various LHM entities, using six (6) different DUNS (Data Universal Numbering System) numbers (a unique nine digit identifier for businesses which contract with the federal government). The oddity of eight separate novations among related LHM entities utilizing six different DUNS numbers was troubling to RELATOR.

### LHM's Actual Cost Data Reflects a $400 Million Overcharge on Contract 0002

31. Given RELATOR' suspicions and the obvious pressure on ACO Velez to have her draft an administrative contracting officer decision to unilaterally close Contract 0002, RELATOR, accompanied by Velez, went to discuss her concerns with Supervisor Klenk on the next day, September 7, 2017. Klenk stated that there was really nothing he could do, but with notable skepticism, suggested that RELATOR could ask a DCMA Cost and Pricing Analyst to pull the "actuals" for Contract 0002 ("actuals" is term of art widely used in the defense contracting community in referring to actual costs incurred by a federal contractor) directly from LHM's

approved cost accounting system, which by law, is maintained in accordance with standards outlined in FAR 30-Part 30. (The regulations require that a federal contractor's cost accounting system must be approved by DCAA through which all costs must flow as acceptable proof of the actual costs incurred under the contract). Supervisor Klenk stated, "good luck finding a pricer that will do it." Generally, DCMA is expected to request the actuals from a contractor only at the time of an audit or final reconciliation which LHM was desperately trying to avoid.

32. That same day, September 7th, RELATOR asked DCMA Price and Cost Analyst Joseph Mikeheal if he would be willing to run a S10 report on JASSM Contract 0002, which is the approved compilation of LHM actual costs maintained in accordance with FAR 30. Mikeheal advised RELATOR that he would run the report if she were capable of obtaining the master account numbers associated with Contract 0002. She was.

33. Later that day, RELATOR casually called Dieffenderfer, with whom she was on good speaking terms, to ask if he could give her the master account numbers so that she could check something needed by DCMA to expedite closing out the contract, downplaying any major concerns. Dieffenderfer told RELATOR that he would get with LHM JASMM Finance and have them give DCMA the master account numbers.

34. That same day, Jamie Lambert (LHM Billing Analyst), after confirming the account numbers with Marie Dolan (LHM JASSM Finance), provided the 25 master account numbers (which covered all of the costs related to JASSM Contract 0002) to ACO Velez. (Exhibit 7). He, in turn, provided the masters to Mikeheal, who then ran the S10 report and provided the actuals to RELATOR and ACO Velez on September 14, 2017. (Exhibit 8).

35. The actual costs pulled by Mikeheal and provided to ACO Velez and RELATOR on September 14, 2017 showed that LHM had actual costs on JASSM Contract 0002 of only **$181,692,070** (Exhibit 9, p. 11) notwithstanding that **$588,161,975 had been invoiced and paid to LHM or its subsidiary, LMIS, a difference more than $400 million.** (*See* Paragraph 24, excel file furnished on June 4, 2017 by Dolan of LHM to Velez of DCMA showing billing and disbursements to LHM of $588,161,975 (Composite Exhibit 6)).

36. Up until this point, most of RELATOR's efforts were aimed at dissuading her ACO from executing a unilateral MOD to close the contract because it was administratively inappropriate in her view and she did not wish to see Velez become the scapegoat. However, the discrepancy of more than $400 million was well beyond anything RELATOR had ever anticipated. Once the actuals were received, they were promptly emailed by Velez to DCMA Supervisor Klenk. Notably, RELATOR heard nothing further from Klenk for several weeks. Relator sensed that she was on uncharted waters and was not getting any support as she might otherwise have expected. It was as though she was the bad guy and not the contractor.

37. On October 12, 2017, a DCMA close-out status meeting was held, chaired by Klenk and attended by Velez, RELATOR, Jessica Zambrano (DCMA ACO), Rose Gilhart (DCMA Contract Administrator), Nestor Retenio (DCMA Contract Administrator), and Carla Powell (DCMA ACO). Klenk advised the team "to watch their contracts" as a $100,000,000 discrepancy was found. It is unknown how Klenk came to that figure but he obviously ignored the actuals provided by Velez, the accuracy and authenticity of which Klenk never challenged. ACO Velez chimed in during the meeting and stated RELATOR had done her own research and found

the discrepancy. The rank and file team praised her actions. Nonetheless, it was apparent that Supervisor Klenk was not pleased with RELATOR or acknowledgement by her peers of the work she had done.

38.     Later that same afternoon, RELATOR went to ACO Velez asking what was going to be done about the overcharge. RELATOR, along with Velez then went to meet with Klenk in his office. When asked about the status of things, Klenk stated that the Agency (DCMA) was working it and that the higher ups had been notified. RELATOR was adamant that Klenk needed to report the discrepancy to an agency outside of DCMA due to the magnitude of the overcharge which could only be attributed to fraud as opposed to mathematical or clerical error. Klenk told RELATOR that her duty to report was satisfied and to hold off on reporting to any outside agency as DCMA management was supposedly working on the issue.

39.     After the meeting, RELATOR once again went to ACO Velez and reiterated that the suspicions of fraud needed to be reported up the DOD chain of command and that it is not DCMA's job (or her job) to investigate suspicions of fraud. ACO Velez told RELATOR, "to calm down," that DCMA was looking into it and that a meeting would be scheduled for the week of November 13-17, 2017. No such meeting was ever held to the best of RELATOR's knowledge. Since the October 12, 2017 close-out meeting, RELATOR has been essentially ignored by her superiors at DCMA with whom she has previously enjoyed a good relationship.

40.     On Saturday, October 21, 2017, RELATOR, from her home, reported her findings to the Office of the Inspector General of DOD. ("DOD OIG") online through the DOD OIG web-based complaint center. The following Tuesday, October 24, 2017, Supervisor Klenk called

RELATOR and Velez into his office and again asked RELATOR not to report her concerns to outside entities. RELATOR found this rather unusual since he had not spoken to her since the October 12 meeting. Whether Klenk was somehow made aware of RELATOR's online complaint to DOD OIG is unknown. The timing of the two incidents, however, speaks for itself. Klenk reassured RELATOR that DCMA was going to meet with DCAA and action would be taken. He suggested an alternative was to settle with LHM for $100 million and not report the fraud to any outside agency. RELATOR did not feel comfortable at that time disclosing to Klenk that she had already reported the matter to DOD OIG (assuming he did not already know) or reminding him that the amount of the fraud was several times greater than the $100 million dollar figure which Klenk referred to at the October 12th meeting without supporting data.

## COUNT I AGAINST BOTH DEFENDANTS UNDER SECTION 3729(a)(1)(C)

41.     RELATOR incorporates and realleges paragraphs 1 through 40 as though more fully set forth herein.

42.     Beginning at a time during negotiations in the early part of 1996 which resulted in the award of the JASSM Contract 0002 to DEFENDANTS or their predecessor-in-interest in June 1996 and continuing through the time of the filing of this Complaint, DEFENDANTS combined, conspired and agreed with each other, and with their respective and each other's officers, agents and employees and other persons unknown to RELATOR at this time, to commit substantive violations of the FCA, now re-numbered as subparagraphs (A), (B) and (G) of Section 3729(a)(1) of the FCA, all in violation of Section 3729(a)(1)(C) of the FCA.

43.     The objects of the conspiracy were: (1) to defraud the United States of hundreds of millions of dollars by over-estimating the projected costs under JASSM Contract 0002 and then

invoicing the government for amounts that greatly exceeded the actual costs; (2) to conceal the fraud by attempting to convince DCMA in 2016 and 2017 of the need to convert JASSM Contract 0002 to a firm fixed price (FFP), thereby avoiding necessity of a DCMA or DCAA audit of actual costs; (3) to further defraud the United States, by after having successfully established inflated costs for the initial JASSM Program, undetected by DCMA or any other federal agency, then being in a position to claim those inflated costs as accurate and reliable "historical costs" upon which LHM could and did negotiate and obtain price-inflated follow-on contracts under the JASSM Program, including the June 2017 award of a $413 million contract with the USAF for the production and delivery of 360 extended range versions of the cruise missile (JASSM-ER), and thereby further defraud the United States; and (4) to knowingly use a false record or statement material an obligation to pay money owed to the Government and/or knowingly concealing or knowingly and improperly avoiding an obligation to pay money owed to the Government.

44.    In furtherance of such conspiracy and to effect the objects of the conspiracy, one or more of DEFENDANTS committed, or caused to be committed, in the Middle District of Florida and elsewhere, the overt acts identified in paragraphs 11, 13, 15, 19, 24, and 29 of this Complaint.

45.    Specifically, DEFENDANTS committed or caused to be committed additional overt acts in furtherance of the conspiracy by having submitted on 169 separate occasions, from on or about August 1996 through July 2008, Department of the Treasury Form 1034, a representative copy of which is attached as Exhibit 10, by which DEFENDANTS unlawfully demanded and received money from the United States to which they were not entitled in an amount in excess of $400 million.

46.    DEFENDANTS committed or caused to be committed an additional overt act on June 4, 2017, in furtherance of the conspiracy when, in direct response to a request by DCMA for

an obligation and disbursement history on JASSM Contract 0002, LHM, acting through its agent and employee, Marie Dolan, provided a excel file showing billed and paid amounts on Contract 0002 of $588,161,975 against the aggregated ceiling or obligated amount of $588,214,052. *See* par. 24, *supra*. The furnishing of this record or statement by LHM to DCMA, the governmental agency which is responsible for auditing and reconciling defense contracts, is actionable under the theory of implied certification because while the record was true on its face, it failed to disclose noncompliance with material statutory, regulatory, or contractual requirements that make its contents misleading with respect to the matter of payment. Representations that state the truth only so far as it goes, while omitting critical qualifying information, can be actionable misrepresentations under the FCA as held by the United States Supreme Court.

47. As a result of the conduct of DEFENDANTS as described in this Count, the United States has suffered actual damages in excess of $400 million and will likely sustain additional damages in view of the award of the follow-on contract to manufacture and deliver 360 extended range (JASSM-ER) missiles at a price well in excess of LHM's undisclosed actual historic costs.

## COUNT II AGAINST BOTH DEFENDANTS UNDER SECTION 3729(a)(1)(G)

48. RELATOR incorporates and realleges paragraphs 1 through 40 and 46 as though more fully set forth herein.

49. DEFENDANTS committed a substantive reverse False Claims Act violation by knowingly making or using a false record or statement material to an obligation to pay money to the Government and/or knowingly concealing or knowingly and improperly avoiding an obligation to pay money to the Government as set forth in paragraphs 15, 19, 24, 29 and 46, Set contact having occurred between March 23, 2016 and continuing through September 6, 2017.

50. As a result of the conduct of DEFENDANTS as described in this Count, the United States has suffered actual damages in excess of $400 million.

## DEMAND FOR RELIEF

RELATOR, acting on behalf of United States and her own behalf, hereby demands and seeks that judgment be entered in favor of United States and against each of DEFENDANTS, jointly and severally as follows:

1.  Under Counts I and II for compensatory damages incurred by the United States in the amount of approximately $400 million or such other amount as may be determined by a jury and trebled;

2.  For civil penalties of not less than $5,500 and not more than $11,000 for each false statement, record and claim or denial of obligation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, made or caused to be made, or conspired to be made, by DEFENDANTS.

3.  For interest on the above treble damages from the date on which the damages were sustained and interest on the civil penalties from the date on which this Complaint is served upon DEFENDANTS; and

4.  For such other and further relief as may be requested by the United States, including injunctive relief, as this Court deems just and fair.

## REQUEST FOR ADDITIONAL RELIEF

In addition, RELATOR, acting on her own behalf, hereby demands and seeks that an award be made in her favor as follows:

1.  For 25% of the proceeds collected by the United States if the Government intervenes;

2.      For 30% of the proceeds collected on behalf of the United States if the Government does not intervene;

3.      For 25% of the proceeds collected by the United States should the Government elect to pursue its claim through any alternate remedy, including any administrative proceeding, as set forth in Section 3730(c)(5) of the False Claims Act;

4.      For all costs and expenses incurred by RELATOR in this action, including her reasonable attorney fees; and

5.      For such other and further relief as this Court deems just and fair.

## DEMAND FOR TRIAL BY JURY

RELATOR, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands trial by jury on all such issues so triable as a matter of right.

Dated: November 22, 2017

Respectfully submitted,

Stephen J. Calvacca, Esquire
Florida Bar No.: 561495
NeJame Law, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, Florida 32801
Telephone: (407) 500-0000
Facsimile: (407) 802-1656
Florida Bar No.: 561495
stephen@nejamelaw.com
darlene@nejamelaw.com
Attorney for Plaintiff-Relator